**Slip Op. 03-52**

# United States Court of International Trade

|  |  |
|---|---|
| CHINA STEEL CORPORATION and YIEH LOONG, Plaintiff, v. UNITED STATES, Defendant, and BETHLEHEM STEEL CORPORATION; NATIONAL STEEL CORPORATION; UNITED STATES STEEL CORPORATION; GALLATIN STEEL COMPANY; IPSCO STEEL INC.; NUCOR CORPORATION; STEEL DYNAMICS, INC.; and WEIRTON STEEL CORPORATION, Defendant-Intervenors. | Before: Pogue, Judge Court No. 01-01040 |

[Plaintiff's motion for judgment on the agency record is denied. The Court sustains the Department of Commerce's final antidumping determination in part, and remands in part.]

Decided: May 14, 2003

Miller & Chevalier Chartered (Karl Abendschein, Peter Koenig) for Plaintiff.

Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, Lucius B. Lau, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Augusto Guerra, Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

Dewey Ballantine LLP (Bradford Ward, Hui Yu) for Defendant-Intervenors Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation.

Schagrin Associates (Roger B. Schagrin) for Defendant-Intervenors Gallatin Steel Company, IPSCO Steel Inc., Nucor Corporation, Steel Dynamics, Inc., and Weirton Steel Corporation.

## Opinion

**Pogue, Judge:** This action is before the Court on the motion of China Steel Corporation ("China Steel") and Yieh Loong (collectively "Plaintiff") for judgment upon the agency record pursuant to USCIT R. 56.2.[1]  Plaintiff contests the final affirmative determination of sales at less than fair value ("LTFV") rendered by the International Trade Administration of the United States Department of Commerce ("Commerce" or "Department") in the investigation of certain hot-rolled carbon steel ("HRCS") flat products from Taiwan for the period October 1, 1999 through September 30, 2000 ("POI").  Certain Hot-Rolled Carbon Steel Flat Products from Taiwan, 66 Fed. Reg. 49,618, 49,618-19 (Dep't

---

[1]For purposes of calculating a weighted-average margin, Commerce concluded prior to the preliminary determination that China Steel and Yieh Loong were affiliated under 19 U.S.C. § 1677(33)(E), and collapsed the two entities into a single producer pursuant to 19 C.F.R. § 351.401(f) (2001).  Dep't of Commerce Mem. from Patricia Tran to Joseph A. Spetrini, Antidumping Duty Investigation on Certain Hot-Rolled Carbon Steel Flat Products from Taiwan: Affiliation Issue regarding China Steel Corporation (China Steel) and Yieh Loong Enterprise Co., Ltd. (Yieh Loong), C.R. Doc. 51, Def.'s Conf. Ex. 5 at 2, 4 (Apr. 19, 2001); see also Certain Hot-Rolled Carbon Steel Flat Products from Taiwan, 66 Fed. Reg. 22,204, 22,207 (Dep't Commerce May 3, 2001) (notice of preliminary determination of sales at less than fair value) ("Prelim. Determ.").  As those two determinations are not challenged in the instant action, the Court will refer to the collapsed entity as "Plaintiff" or "CSC/YL;" all other references to the two corporations by their proper names shall refer only to the respective individual corporation.

Commerce Sept. 28, 2001) (notice of final determination of sales at LTFV) ("Final Determ."). Specifically, Plaintiff contests four aspects of Commerce's final determination: (1) Commerce's affiliation determination regarding the Yieh Loong affiliates; (2) Commerce's decision to apply facts otherwise available; (3) Commerce's decision to apply adverse facts available; and (4) Commerce's conduct in investigating the antidumping petition. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000). For the reasons set forth below, the Court sustains in part, and remands in part, the agency's determination.

## I. Background

On November 13, 2000, Gallatin Steel Company, IPSCO Steel Inc., Nucor Corporation, Steel Dynamics, Inc., Weirton Steel Corporation, Bethlehem Steel Corporation, U.S. Steel Group (a unit of USX Corporation), National Steel Corporation, United Steelworkers of America, LTV Steel Company, Inc., and Independent Steelworkers Union (collectively "Domestic Producers")[2] initiated

---

[2]U.S. Steel Group (a unit of USX Corporation), United Steelworkers of America, LTV Steel Company, Inc., and Independent Steelworkers Union are not parties to this action.
Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation collectively will be referred to as "Defendant Intervenors I," while Gallatin Steel Company, IPSCO Steel Inc., Nucor Corporation, Steel Dynamics, Inc., and Weirton Steel Corporation collectively will be referred to as "Defendant Intervenors II."
Plaintiff's counsel changed affiliation from Ablondi, Foster, Sobin & Davidow, P.C., to Miller & Chevalier Chartered

an antidumping investigation with Commerce.  Certain HRCS Flat Products from Argentina, India, Indonesia, Kazakhstan, the Netherlands, the People's Republic of China, Romania, South Africa, Taiwan, Thailand, and Ukraine, 65 Fed. Reg. 77,568, 77,568 (Dep't Commerce Dec. 12, 2000) (notice of initiation of antidumping duty investigations) ("Initiation Notice").  The Domestic Producers alleged that imports of HRCS flat products from Argentina, India, Indonesia, Kazakhstan, the Netherlands, the People's Republic of China, Romania, South Africa, Taiwan, Thailand, and Ukraine were being or likely to be sold at LTFV.[3]  Id. at 77,569.  On December 4, 2000, Commerce initiated an investigation to determine whether

---

prior to seeking judicial review of Commerce's affirmative LTFV determination with the Court.

[3]An antidumping duty is imposed upon imported merchandise if that merchandise is sold or is likely to be sold in the United States at LTFV, and an industry in the United States is materially injured or is threatened with material injury.  See 19 U.S.C. § 1673.  To determine whether merchandise is sold at LTFV, Commerce compares the price of the imported merchandise in the United States to the normal value for the same or similar merchandise in the home market.  See 19 U.S.C. § 1677b(a).
Normal value is the comparable price for a product like the imported merchandise when first sold (generally, to unaffiliated parties) "for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i).  Export price is the "price at which the subject merchandise is first sold . . . by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser," 19 U.S.C. § 1677a(a); constructed export price means the "price at which the subject merchandise is first sold . . . in the United States . . . [by a] producer or exporter . . . to a purchaser not affiliated with the producer or exporter."  19 U.S.C. § 1677a(b).

certain HRCS flat products were being sold at LTFV in the United States.  Prelim. Determ., 66 Fed. Reg. at 22,204.  In their petition for unfair trade relief, the Domestic Producers identified China Steel and Yieh Loong as principal Taiwanese producers of the subject merchandise.  Initiation Notice, 65 Fed. Reg. at 77,576.

Commerce issued an antidumping duty questionnaire to China Steel and Yieh Loong requesting responses to sections A (General Information), B (Sales in the Home Market or to Third Countries), C (Sales to the United States), and D (Cost of Production) on January 4, 2001.  Final Determ., 66 Fed. Reg. at 49,619; Letter from Robert James, Program Manager, Int'l Trade Admin., to Ablondi, Foster, Sobin & Davidow, P.C., P.R. Doc. 28, Pl.'s Ex. 2 at 2 (Jan. 4, 2001) ("Questionnaire I").[4]  Commerce explicitly informed China Steel and Yieh Loong that "[i]f [either respondent were] unable to respond to this questionnaire within the specified time limits, [the respondent] must formally request an extension of time." Questionnaire I, P.R. Doc. 28, Pl.'s Ex. 2 at 2.  Questionnaire I directed China Steel to provide affiliated parties' resale information if "sales to affiliates constituted more than five percent of total home market sales."  Final Determ., 66 Fed. Reg. at 49,621.  That questionnaire defined "affiliated persons" according to Section 771(33) of the Tariff Act of 1930, as amended,

_____

[4]Citations to the administrative record include references to both public documents ("P.R. Doc.") and proprietary documents ("C.R. Doc.").

and §§ 351.102(b) and 351.401(f) of the Department's regulations. Questionnaire I, P.R. Doc. 28 at app. I.

China Steel requested to be excused from reporting home market resales by affiliates on January 19, 2001, as sales to its affiliates, China Steel Global Trading Corporation and China Steel Chemical Corporation, constituted less than five percent of its total home market sales. Final Determ., 66 Fed. Reg. at 49,621. Commerce responded on January 29, 2001, stating that the agency could not make a determination based on the information China Steel provided, and requested China Steel to "document the total quantity of subject merchandise sold to all affiliated parties." Id.

China Steel and Yieh Loong submitted responses to section A of Questionnaire I on February 2, 2001. Id. at 49,619. The following day, China Steel and Yieh Loong requested a three week extension of time to complete sections B, C, and D of Questionnaire I, stating that the information required was extensive and complex, and the employees answering the questions had also been finalizing the respective companies' accounts. Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, P.R. Doc. 38, Pl.'s Ex. 3 at 1 (Feb. 3, 2001). Commerce granted that request in part, extending the deadline to February 22, 2001, and warning the two companies that the statutory deadlines imposed on the agency were "mandatory, not optional in nature." See Letter from Robert James, Program Manager, Int'l

Trade Admin., to China Steel Corporation and Yieh Loong Enterprise, Co., Ltd., c/o Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., P.R. Doc. 115, Pl.'s Ex. 9 at 1-2 (Apr. 25, 2001) ("Denial Letter"). China Steel and Yieh Loong again requested an additional week of time on February 14, 2001 for the same reasons described above to complete sections B and D of Questionnaire I. Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, P.R. Doc. 43, Pl.'s Ex. 4 (Feb. 14, 2001).

On February 26, 2001, China Steel and Yieh Loong filed their responses to sections B, C, and D of Commerce's Questionnaire I. Final Determ., 66 Fed. Reg. at 49,619. The following day, Commerce issued supplemental section A questionnaires to China Steel and Yieh Loong seeking, among other things, clarification of each companies' relationship with other companies. See Letter from Robert James, Program Manager, Int'l Trade Admin., to Yieh Loong Enterprise, Co., Ltd., c/o Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., C.R. Doc. 21, Def.'s Conf. Ex. 2 at 1, supp. questionnaire para. 5, 8, 9 (Feb. 27, 2001); Letter from Robert James, Program Manager, Int'l Trade Admin., to China Steel Corporation, c/o Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., C.R. Doc. 22, Def.'s Conf. Ex. 3 at 1, supp. questionnaire para. 3-4 (Feb. 27, 2001).

On March 15, 2001, Commerce issued supplemental sections B and

C questionnaires to China Steel and Yieh Loong (collectively "Questionnaire II"), seeking missing product characteristics information. Final Determ., 66 Fed. Reg. at 49,620; Letter from Robert James, Program Manager, Int'l Trade Admin., to Yieh Loong Enterprise, Co., Ltd., c/o Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., P.R. Doc. 69, Def.'s Ex. 2 (Mar. 15, 2001) (instructing that a "complete" response be provided by March 28, 2001) (emphasis in original) ("YL's Questionnaire II"). Commerce again requested that China Steel provide data containing "all affiliated parties' resale information, [which includes sales by] (Yieh Loong, China Steel Chemical [Corporation], China Steel Global [Trading Corporation], Yieh Phui [Enterprise Co. Ltd.], [and] Yieh Hsing [Enterprise Co. Ltd.]) to the first unaffiliated party." Final Determ., 66 Fed. Reg. at 49,621; see also Letter from Robert James, Program Manager, Int'l Trade Admin., to China Steel Corporation, c/o Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., C.R. Doc. 27, Def.-Int. II's Conf. Ex. 3 at 1, supp. questionnaire para. 3 (Mar. 15, 2001) ("CSC's Questionnaire II"). Commerce further directed China Steel to "[f]ully report the [product] characteristics of 'leeway' and overrun merchandise following the criteria specified in [the agency's] [Q]uestionnaire [I]." CSC's Questionnaire II, C.R. Doc. 27, Def.-Int. II's Conf. Ex. 3 supp. questionnaire para. 5.

China Steel and Yieh Loong submitted their responses to the

supplemental section A questionnaire on March 20, 2001 ("CSC's Mar. 20 Response"). Final Determ., 66 Fed. Reg. at 49,619. On March 21, 2001 and March 26, 2001, China Steel and Yieh Loong submitted additional responses to accompany their March 20, 2001 submission. Id. Also on March 21, 2001, Commerce issued supplemental section D questionnaires to China Steel and Yieh Loong. Id. at 49,620. Both entities requested an extension of time to file their sections B, C, and D supplemental responses on March 22, 2001, arguing that the Department's requests were extremely burdensome because of the short deadlines and complex nature of the issues and transactions. Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, P.R. Doc. 80, Pl.'s Ex. 6 (Mar. 22, 2001). Another extension of time was requested on March 30, 2001 for ten days in order for China Steel to prepare affiliate resale information pertaining to Commerce's Questionnaire II, because the affiliates' records were kept in a system from which China Steel could not easily extract the information. See Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, P.R. Doc. 85, Pl.'s Ex. 7 (Mar. 30, 2001). The two companies each filed responses to Questionnaire II on April 3, 2001. Final Determ., 66 Fed. Reg. at 49,620. China Steel and Yieh Loong then filed their responses to the supplemental section D questionnaires on April 9, 2001. Id.

Questionnaire III was issued to China Steel and Yieh Loong on

April 17, 2001 and April 18, 2001 with respect to each company's sections B, C, and D responses, requesting that China Steel supply complete product characteristics and downstream sales information, and that Yieh Loong supply downstream sales' narratives and supporting documentation for all expenses and adjustments. Id. On April 23, 2001, China Steel and Yieh Loong filed a request seeking a four day extension to file their responses to Commerce's Questionnaire III. Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, P.R. Doc. 108, Pl.'s Ex. 8 at 2 (Apr. 23, 2001) ("Extension Request"). That same letter also requested an extension of the "preliminary and/or final" determinations to permit sufficient time for the two companies to defend their cases, given that the investigation was complex and the affiliated parties would not cooperate with Plaintiff's requests for resale information. Id. at 1-2. Nonetheless, the two corporations submitted their responses to Questionnaire III on April 23, 2001. Final Determ., 66 Fed. Reg. at 49,620. Commerce denied the four-day and preliminary determination time extension requests on April 25, 2001. Denial Letter, P.R. Doc. 115, Pl.'s Ex. 9 at 2.

On May 3, 2001, Commerce published its preliminary determination of sales at LTFV. Prelim. Determ., 66 Fed. Reg. at 22,204. Among other things, Commerce concluded that China Steel was affiliated with Yieh Loong's affiliates, Yieh Hsing Enterprise

Co. Ltd. ("YH"), and Yieh Phui Enterprise Co., Ltd ("YP"), as a result of collapsing China Steel and Yieh Loong, and that China Steel was required to report those two affiliates' downstream sales data. See id. at 22,207. Commerce also concluded that China Steel failed to cooperate to the best of its ability "[i]n light of China Steel's repeated failure to provide affiliated sales information and . . . all necessary product characteristics or to provide any meaningful explanation of why such data could not be provided." Id. at 22,208. Accordingly, Commerce applied an adverse facts available dumping margin to sales made by the collapsed entity. Id.

A week later, on May 10, 2001, Commerce cancelled the sales and cost verifications for the two companies. Final Determ., 66 Fed. Reg. at 49,620 (internal citation omitted). On May 30 and 31, 2001, China Steel and Yieh Loong submitted additional responses to Commerce's Questionnaire III. Id. Those responses subsequently were returned to the respective companies by Commerce because the Department found them untimely. Id. (internal citation omitted).

On July 17, 2001, Commerce published a postponement of the final determination for this investigation. Certain HRCS Flat Products from Taiwan, 66 Fed. Reg. 37,213, 37,214 (Dep't Commerce July 17, 2001) (postponement of final determination for antidumping duty investigation) ("Postponement Notice"). The agency also delayed its final determination by four days in light of the tragic

events of September 11, 2001.  Final Determ., 66 Fed. Reg. at

49,618-19.  Commerce published its affirmative final determination

on September 28, 2001.  Id. at 49,618.[5]

In rendering its affirmative LTFV determination, Commerce made

several findings.  First, Commerce found that China Steel was

affiliated with Yieh Loong's affiliates because "[c]ollapsed

companies constitute a single entity and therefore affiliates of

either company are affiliates of the collapsed entity."  Issues and

Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at 6; see also Final

Determ., 66 Fed. Reg. at 49,621.  Accordingly, Commerce concluded

that China Steel's home market sales to affiliated parties

constituted more than five percent of its total sales, thereby

requiring China Steel to report all resale information.  See Final

Determ., 66 Fed. Reg. at 49,621.

Second, Commerce determined that the use of facts available

was appropriate pursuant to 19 U.S.C. § 1677e(a)(2)(A)-

1677e(a)(2)(C) because CSC/YL "withheld information requested by

the Department, failed to supply such information by the applicable

deadlines and has significantly impeded this proceeding," and also

---

[5]Commerce's final determination incorporates by reference
the agency's Issues and Decision Memorandum, which responds to
CSC/YL's and the Domestic Producers' comments filed during the
antidumping investigation.  Dep't of Commerce Mem. from Joseph A.
Spetrini to Faryar Shirzad, Issues and Decision Memo for the
Antidumping Investigation of Certain HRCS Flat Products from
Taiwan - October 1, 1999 through September 30, 2000, P.R. Doc.
151, Def.'s Ex. 8 (Sept. 21, 2001) ("Issues and Decision Mem.").

failed to request any modification of the reporting requirements. See id. at 49,620. In particular, Commerce found that CSC/YL's affiliated party resales responses were "incomplete, deficient, and inconsistent" because China Steel only reported downstream sales made after February 21, 2000 by Yieh Loong, YP, and YH. See Final Determ., 66 Fed. Reg. at 49,621. Moreover, Yieh Loong's downstream sales information failed to provide narratives and supporting documentation for all expenses and adjustments. Id. Commerce concluded that Plaintiff's product characteristics data contained deficiencies because the information failed to describe the "quality, carbon, yield strength, thickness, and width [characteristics for] a significant percentage of its home market sales," and that such merchandise was "prime quality," which could be matched to U.S. sales of prime quality merchandise. See id. at 49,621-22. Commerce stated that those deficiencies precluded the sales data from being used for cost tests, model matching, or price comparisons. Id. at 49,622. Without this information, the agency stated that it was unable to accurately calculate a dumping margin. Id. at 49,621. Finally, Commerce concluded that the sales information provided by Plaintiff overall "was too incomplete to form a reliable basis for making a determination and that [Plaintiff] has not acted to the best of its ability in providing information." Id. at 49,620.

Third, Commerce determined that China Steel failed to

cooperate to the best of its ability because it repeatedly ignored instructions to submit complete product characteristics and accurate downstream sales data, and "never provided alternatives or reasonable explanations for why it could not report all downstream sales." Id. at 49,622. Without this information, Commerce stated that it was unable to calculate an accurate margin, use China Steel's home database to match sales of identical or most similar products, or properly perform a cost test for home market sales. Id. Commerce also noted that Plaintiff "repeatedly told the Department that the missing information would be forthcoming." Id. at 49,620. As Plaintiff's deficient responses affected a "significant" portion of its responses, Commerce found the submitted data unusable for purposes of calculating a dumping margin. Id. at 49,622. Commerce therefore determined that the application of adverse facts available was appropriate pursuant to 19 U.S.C. § 1677e(a)(2)(B), (b). Id. at 49,620. Accordingly, Commerce assigned Plaintiff an adverse facts available dumping margin of 29.14 percent. Id. at 49,622.

## II. Standard of Review

In reviewing final determinations in antidumping duty investigations, the Court will hold unlawful those agency determinations which are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §

1516a(b)(1)(B)(I) (2000).

### III. Discussion

There are four issues presented.  The Court must determine whether: (1) Commerce's affiliation determination is supported by substantial evidence and in accordance with law, (2) Commerce's decision to apply facts available is in accordance with law, (3) Commerce's decision to use adverse facts available is supported by substantial evidence and in accordance with law, and (4) Commerce's conduct during the investigation was arbitrary and capricious, or an abuse of discretion.

### A. Affiliation[6]

Commerce concluded that CSC/YL was affiliated with YH, YP, and Persistence Hi-Tech Materials Inc. ("Persistence") pursuant to 19 U.S.C. §§ 1677(33)(F), (G) on the basis of the following evidence: (1) Yieh Loong, aware of the statutory definition of "affiliated parties," conceded affiliation with YH, YP, and Persistence in its section A questionnaire responses; (2) Yieh Loong, YH, YP, and Persistence shared a common chairman of the board; (3) Taiwanese

---

[6]With the passage of Uruguay Round Agreement Act ("URAA"), Congress modified U.S. trade law and replaced the concept of "exporter" with the definition of "affiliated persons" as of January 1, 1995.  URAA, Pub. L. No. 103-465, 108 Stat. 4809, 4875-76 (1994); compare 19 U.S.C. § 1677(33) (2000) with 19 U.S.C. § 1677(13) (1988).

law grants "extensive power" to chairmen of the board; and (4) Yieh Loong, YH, and YP each own a minority stock interest in one another.  Issues and Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at 6-7; Dep't of Commerce Mem. from Patricia Tran to File, Certain HRCS Flat Products from Taiwan – China Steel Corporation (China Steel), Yieh Loong Enterprise (Yieh Loong), and affiliated resellers, C.R. Doc. 50, Def.'s Conf. Ex. 4 at 2 (Apr. 19, 2001) ("Affiliated Resellers Mem.").  In reaching that conclusion, Commerce first found that Yieh Loong is affiliated with YH, YP, and Persistence.  Issues and Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at 7.  Commerce then concluded that "China Steel is affiliated with Yieh Loong's affiliates," because "[c]ollapsed companies constitute a single entity and therefore affiliates of either company are affiliates of the collapsed entity."  See id. at 6-7. In support of its determination, the Department cites Stainless Steel Sheet and Strip in Coils from Germany, 64 Fed. Reg. 30,710 (Dep't Commerce June 8, 1999) (final determination of sales at LTFV).[7]  Issues and Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at

---

[7]Commerce's reliance on Stainless Steel and Strip in Coils from Germany is misplaced, as the agency in that case found affiliation based on Thyssen's common control over its affiliates and KTS pursuant to 19 U.S.C. § 1677(33)(E)-(F).  See 64 Fed. Reg. at 30,723-24.  While Commerce relied on subsection (F) in rendering its determination here, the Department's decision also was based on subsection (G).  More importantly, Commerce does not rely on "common control" pursuant to subsection (F) or equity ownership pursuant to subsection (E) to support its affiliation determination in this case.  Thus, Commerce's reliance on Stainless Steel and Strip in Coils from Germany does not support

7.

Plaintiff challenges Commerce's conclusion that it is affiliated with YH, YP, and Persistence, claiming that CSC/YL does not "control" the resellers' pricing. See Pl.'s Br. Supp. Mot. J. Agency R. at 15 ("Pl.'s Br."). Plaintiff argues that control is lacking for several reasons. First, as stated in its certified statement to Commerce, Plaintiff claims that the common chairman between Yieh Loong, YH, YP, and Persistence is not responsible for pricing or daily operations, but rather meets with the board of directors several times a year to handle macroeconomic and investment issues. Id. at 15-16. Second, although Yieh Loong, YH, and YP retain a minority ownership interest of less than three percent in each other, the common chairman only has influence to the extent of that ownership percentage. Id. at 17. Third, Plaintiff asserts that "[a] party's statements on affiliation, including in financial statements" do not support Commerce's affiliation determination. Id. at 18. Plaintiff's final argument contends that it is not required, as a matter of law, to submit pre-affiliation downstream sales data where China Steel became affiliated with Yieh Loong, and purportedly in turn to YP, YH, and Persistence only on February 21, 2000, a point almost five months into the POI. Pl.'s Br. at 20.

Affiliation is defined statutorily at 19 U.S.C. § 1677(33),

_____

the Department's determination here.

stating, in relevant part:

> [t]he following persons shall be considered to be "affiliated" or "affiliated persons:"
>
>  . . .
>
>     (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
>     (G) Any person who controls any other person and such other person.

19 U.S.C. § 1677(33); see also 19 C.F.R. § 351.102(b) (2001)

(defining "[a]ffiliated person; affiliated parties" according to 19

U.S.C. § 1677(33)).  The statute further expounds that "a person

shall be considered to control another person if the person is

legally or operationally in a position to exercise restraint or

direction over the other person."  19 U.S.C. § 1677(33); see also

Uruguay Round Agreements Act, Statement of Administration Action,

H.R. Doc. No. 103-465 at 838 ("SAA").[8]

    To determine whether "control" exists, Commerce's regulations

direct the agency to consider the following factors, "among others:

corporate or family groupings; franchise or joint venture

agreements; debt financing; and close supplier relationships."  19

C.F.R. § 351.102(b).  Commerce, however, is precluded from finding

"control" on the basis of those factors "unless the relationship

---

[8]The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements . . . . [T]he Administration understands that it is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this statement."  SAA at 656.

has the potential to impact decisions concerning the . . . pricing, . . . of the subject merchandise." Id. Commerce shall also "consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control." 19 C.F.R. § 351.102(b); see also Hontex Enter., Inc. v. United States, slip. op. 03-17 at 39 (CIT Feb. 13, 2003).

Neither the statute nor Commerce's regulations, however, prescribe how Commerce should determine when a party is affiliated with a collapsed entity. Thus, the Court must consider whether Commerce's affiliation determination is based on a permissible construction of the antidumping statute. See AK Steel Corp. v. United States, 22 CIT 1070, 1084-85, 34 F. Supp. 2d 756, 767-68 (1998).

Plaintiff claims that the existence of a common chairman cannot support a determination of "control" here because that individual is not responsible for pricing or daily operations, but rather meets with the board of directors several times a year to discuss macroeconomic and investment issues. Pl.'s Br. at 15; see also Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, C.R. Doc. 54, Pl.'s Conf. Ex. 9 supp. questionnaire para. 1 (Apr. 23, 2001) ("YL's Apr. 23 Response") (certifying that "[t]he President [instead of the board] makes the final determinations as to the

pricing and slab purchasing of Yieh Loong").  In support of that argument, Plaintiff contends that Commerce erroneously failed to discuss Taiwan Company Law Article 193,[9] which requires listed companies, such as China Steel and Yieh Loong, to sell to affiliates at the same market price as non-affiliates in order to avoid price controls and conflicts of interest.  Pl.'s Br. at 15-17.[10]  Taiwan Company Law Article 193 deems directors personally liable to the company for causing loss or damage for violations of

---

[9]Article 193 states, in relevant part:

> The board of directors, in conducting business, shall act in accordance with laws and ordinances, [and] the articles of incorporation . . . .
> Where any resolution adopted by the board of directors contravenes the aforesaid provisions, thereby causing loss or damage to the company, all directors taking part in the adoption of such resolution shall be liable to compensate the company for such loss or damage.

YL's Apr. 23 Response, C.R. Doc. 54 at Ex. 22 art. 193; see also Investment Laws of the World: Taiwan art. 193 (Int'l Ctr. for Settlement of Inv. Disputes, ed. 1982).

[10]Plaintiff also claims that "Commerce unreasonably and unlawfully, failed to investigate further, . . . if it had concerns as to [Yieh Loong's] certified statement."  Pl.'s Br. at 17 (citing Olympia Indus., Inc. v. United States, 22 CIT 387, 392, 7 F. Supp. 2d 997, 1002 (1998)).  Plaintiff's reliance on Olympia Indus. is misplaced.  In that case, Commerce failed to further investigate or explain its rejection of data submitted by a party who believed that its submission was the best information available.  22 CIT at 390, 392, 7 F. Supp. 2d at 1001-02.  Here, Commerce explicitly rejected Plaintiff's certified statement and supported that rejection by discussing the extensive power granted to chairmen under Taiwan Company Law Articles 202 and 208.  Issues and Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at 6-7.

the law or the company's articles of incorporation.  <u>Investment Laws of the World: Taiwan</u>, <u>supra</u> note 9.

Plaintiff's claim misstates the antidumping statute.  Rather than requiring actual exercise of control, the statute only requires that a person is "legally or operationally in a position to exercise restraint or direction over the other person."  19 U.S.C. § 1677(33); SAA at 838 (same); <u>see also</u> <u>Ta Chen Stainless Steel Pipe, Ltd. v. United States</u>, 23 CIT 804, 813 (1999) ("The statute focuses on the capacity to control, rather than on the actual exercise of control.") (citing <u>Ferro Union, Inc. v. United States</u>, 23 CIT 178, 192, 44 F. Supp. 2d 1310, 1324 (1999)).  As stated by Commerce in its explanatory comments to its final rule, the agency "focus[es] on relationships that have the potential to impact decisions concerning production, pricing or cost.  This does not mean however, that proof is required that a relationship in fact has had such an impact."  <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. 27,296, 27,297-98 (Dep't Commerce May 19, 1997) (final rule).

In this case, Commerce did not base its finding of control on actual proof that the common chairman influences the pricing decisions of YH, YP, and Persistence.  Instead, Commerce apparently concluded that the common chairman was operationally in a position to affect pricing decisions, because Taiwan law grants extensive power to the chairman of the board.  <u>See</u> Issues and Decision Mem.,

P.R. Doc. 151, Def.'s Ex. 8 at 6-7.  The record reveals that Taiwanese law generally extends chairmen of the board "'the power to perform every act in connection with the business operations of the company,'" and in practice, "'may engage in significant transactions without seeking approval of the company's board of directors.'"  Affiliated Resellers Mem., C.R. Doc. 50, Def.'s Conf. Ex. 4 at 2 (quoting Paul Cassingham and Nicholas Chen, <u>Taiwan-Joint Ventures in an Uncommon Law Jurisdiction</u>, Int'l Tax Rev. (1992)); <u>see also</u> <u>Investment Laws of the World: Taiwan</u>, <u>supra</u> note 9 at art. 202 (granting the board of directors the power to transact all of the company's business).[11]  The record also reveals that Taiwanese

---

[11]Plaintiff asserts that the article "is not in the [Department's] record of this proceeding, rendering its use impermissible."  Pl.'s Reply to Opp'n. Mot. J. Agency R. at 10 n.13 ("Pl.'s Reply").  As the article is cited in the agency's Affiliated Resellers Memorandum, C.R. Doc. 50, Def.'s Conf. Ex. 4 at 2, and as that memorandum was created by the agency during the course of this proceeding, the Court concludes that the article is part of the record.  19 U.S.C. § 1516a(b)(2)(A) (noting that the record consists of "all governmental memoranda pertaining to the case"); 19 C.F.R. § 351.104(a) (stating that the Department "will include in the official record all factual information . . . or other material developed by, presented to, or obtained by the [agency] during the course of a proceeding").  Moreover, the article was available in the public domain during the agency's investigation of this case.  Cassingham and Chen, <u>supra</u> p. 22, <u>at</u> http://www.perkinscoie.com/resource/intldocs/uncommon.htm (Apr. 16, 2001).

Plaintiff further argues that the article is inapplicable because it was published prior to the POI.  <u>See</u> Pl.'s Reply at 10 n.13.  The Court disagrees.  Because the article was obtained by the agency during the course of this proceeding, and because the article was expressly incorporated into the Affiliated Resellers Memorandum, the Court can properly review the affiliation decisions using such information.  <u>Cf.</u> <u>Floral Trade Council v. United States</u>, 13 CIT 242, 243, 709 F. Supp. 229, 230-31 (1989)

law grants chairmen the power to call and direct board meetings. See Investment Laws of the World: Taiwan, supra note 9 at art. 208, 203 (stating that "[t]he chairman of the board of directors shall internally preside at the meetings of . . . . the board of directors" and that "[m]eetings of the board of directors shall be convened by the chairman of the board"). Finally, the record indicates Yieh Loong admitted that its board of directors conform to these responsibilities. YL's Apr. 23 Response, C.R. Doc. 54 at 2 ("Since Yieh Loong is a company duly organized and existing under the law of [Taiwan], it follows [Taiwan] Company Law with respect to the responsibilities of the Board of Directors."). Thus, the Court finds that Commerce's determination that the common chairman was operationally in a position to exercise direction over pricing decisions is supported by substantial evidence.

The Department's final determination and supporting memoranda fail to explicitly address Article 193. It can be presumed, however, that the agency considered this article in light of the fact that the Department directly discusses other articles of Taiwan Company Law in rendering its final determination. See Issues and Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at 6-7; China

---

(finding that the record contains "those documents at the agency which become sufficiently intertwined with the relevant inquiry . . . no matter how or when they arrived at the agency," and that the agency's express reference in its determination to "the original investigations by the ITC and the Department" incorporated all relevant information from those prior investigations into the record) (internal citation omitted).

Nat'l Mach. Imp. & Exp. Corp. v. United States, slip. op. 03-16 at 19 (CIT Feb. 13, 2003) ("[T]he agency is presumed to have considered all of the evidence in the record, and the burden is on the plaintiff to prove otherwise.") (internal citations omitted); see also Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (holding that the Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned") (internal citation omitted). Even though Article 193 seems to support Plaintiff's certified statement that the common chairman does not "control" pricing or daily operations, Commerce determined that the common chairman was operationally in a position of control under Taiwanese law. As Commerce ultimately bears the responsibility of weighing the evidence, the Court may not substitute its judgment for that of the agency. See Corus Staal BV v. United States, slip. op. 03-25 at 11 (CIT Mar. 7, 2003). Even if there is some evidence which detracts from the agency's conclusions, the Court need only determine whether the Department's conclusions are substantially supported by the record. See id.; Olympia Indus., Inc., 22 CIT at 389, 7 F. Supp. 2d at 1000 (citing Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1563 (Fed. Cir. 1984)).

Plaintiff's second argument contends that control is lacking because the common chairman only has the power to influence the board of director's decisions to the extent of the shares his

company owns, which in this case is less than 3 percent. Pl.'s Br. at 17. Plaintiff's argument again incorrectly states the statutory requirements, as it focuses only on a finding of actual control, rather than the capacity for control. As such, the Court finds this argument lacks merit.

Plaintiff's third argument that a party's affiliation statements, including those made in financial statements, are not substantial evidence of affiliation is unfounded. In fact, only one of the four agency determinations cited in Plaintiff's Brief lends support for CSC/YL's claim, but even that determination only stands for the limited proposition that admissions of affiliation contained in an entity's financial statements alone insufficiently establish affiliation. Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, 64 Fed. Reg. 38,756, 38,769 (Dep't Commerce July 19, 1999) (notice of final determination of sales at LTFV) ("Certain Steel Products from Brazil"). Thus, the Court finds Plaintiff's third argument also lacks merit.

Plaintiff's final contention is that it is not required, as a matter of law, to submit pre-affiliation downstream sales data where China Steel became affiliated with Yieh Loong, and purportedly in turn to YP, YH, and Persistence, only on February 21, 2000. Pl.'s Br. at 20. Commerce's own regulation requires that it consider the temporal aspect of a relationship in determining whether control exists. 19 C.F.R. § 351.102(b). In

Hontex Enter., Inc., slip. op. 03-17 at 39-40, the Court refused to sustain Commerce's determination where the agency failed to address the temporal aspect of the entities' relationships, and explain why that factor was not necessary to its determination. Here, too, Commerce has failed to address the temporal aspect of the relevant parties' relationships, or to explain why that factor is not necessary to its determination. Accordingly, the Court cannot sustain Commerce's determination. Torrington Co. v. United States, 82 F.3d 1039, 1049 (Fed. Cir. 1996) ("Commerce, like other agencies, must follow its own regulations.") (citing Fort Stewart Sch. v. Fed. Labor Relations Auth., 495 U.S. 641, 654 (1990) (internal citation omitted)). On remand, Commerce will have the opportunity to reconsider the temporal aspect of the pertinent parties' relationships.

The Court therefore finds aspects of Commerce's determination that Yieh Loong is affiliated with YH, YP, and Persistence, and that China Steel is affiliated with Yieh Loong's affiliates, supported by substantial evidence. The Court, however, remands the decision because the agency failed to consider the temporal aspect of the parties' relationships, and as such, finds the agency's determination not in accordance with law.

**B. Facts Otherwise Available**

The second issue concerns Commerce's decision to apply facts

otherwise available.  Commerce determined that the application of facts available was appropriate in this case pursuant to 19 U.S.C. § 1677e(a)(2)(A)-(C), because CSC/YL "withheld information requested by the Department, failed to supply such information by the applicable deadlines and has significantly impeded this proceeding," and also failed to request any modification of the reporting requirements with respect to the deficient downstream sales and product characteristics information.  See Final Determ., 66 Fed. Reg. at 49,620.  In particular, Commerce found deficiencies in the downstream sales and product characteristics information submitted by Plaintiff in response to the agency's Questionnaires I, II, and III.  See id.  Commerce concluded that CSC/YL's affiliated party resales responses were "incomplete, deficient, and inconsistent" because China Steel only reported downstream sales made after February 21, 2000 by Yieh Loong, YP, and YH.  See id. at 49,621.  Moreover, Yieh Loong's downstream sales information failed to provide narratives and supporting documentation for all expenses and adjustments.  Id.  Commerce concluded that Plaintiff's product characteristics data contained deficiencies because the information failed to describe the "quality, carbon, yield strength, thickness, and width [characteristics for] a significant percentage of its home market sales," and that such merchandise was "prime quality," which should be matched to U.S. sales of prime quality merchandise. See id. at 49,621-22.

Plaintiff challenges Commerce's facts otherwise available determination as not in accordance with law.  See Pl.'s Br. at 22. Plaintiff raises several arguments supporting that contention. First, Plaintiff contends that Commerce failed to provide Yieh Loong notice and an opportunity to remedy China Steel's deficient information prior to applying facts available, because Commerce did not notify Yieh Loong of China Steel's deficient downstream sales and missing product characteristics data until the agency decided to collapse the two entities in its preliminary determination, and because Commerce would not accept any additional information after such date.  Id. (citing Case Brief of Yieh Loong and China Steel Corporation before the U.S. Dep't of Commerce, P.R. Doc. 140, Pl.'s Ex. 14 at 8 ("Case Br.")).

Second, Plaintiff claims it notified Commerce in its first response to sections B, C, and D that it was unable to report certain home market "leeway" overrun product characteristics in accordance with 19 U.S.C. § 1677m(c)(1), because that information was not readily available.  Pl.'s Br. at 30 (citing Letter from Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, C.R. Doc. 17, Pl.'s Conf. Ex. 3 at 5-6 (Feb. 26, 2001) ("CSC's Feb. 26 Response")).  Plaintiff also claims that it notified Commerce of the problems it encountered in collecting downstream sales information.  Pl.'s Br. at 30 (citing Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow,

P.C., to U.S. Sec'y of Commerce, C.R. Doc. 43, Pl.'s Conf. Ex. 8 at 2 (Apr. 10, 2001) ("CSC's Apr. 10 Letter")); Extension Request, P.R. Doc. 108, Pl.'s Ex. 8 at 2.  Thus, Plaintiff argues that Commerce was required to simplify its requests for information and offer assistance.  See Pl.'s Br. at 30.  Commerce responds that Plaintiff failed to provide a full explanation of its difficulty meeting reporting requirements and to suggest alternative forms in which it was capable of providing the requested information. Def.'s Mem. Opp'n to Mot. J. Agency R. at 30 ("Def.'s Mem.").

Last, Plaintiff argues that Commerce should have considered its deficient data because CSC/YL acted in accordance with 19 U.S.C. § 1677m(e).  Pl.'s Br. at 30-31.

Title 19 U.S.C. § 1677e(a) permits Commerce to use "facts otherwise available" in reaching determinations where "necessary information is not available on the record," or an interested party withholds requested information, fails to submit the requested information by the deadline or provide such information in the form and manner requested, significantly impedes an investigation, or provides the requested information in an unverifiable form.  19 U.S.C. § 1677e(a).  Before resorting to facts available, however, the Department is required to comply with the notice and remedial requirements of § 1677m(d).[12]  Id.  Nonetheless, if the remedial

_____

[12]Section 1677m(d) requires the Department to "promptly inform the person submitting the response of the nature of the deficiency and . . . to the extent practicable, provide that

response or explanation is found unsatisfactory or untimely, the

Department may, subject to § 1677m(e),[13] "disregard all or part of

the original and subsequent responses" in favor of facts available.

19 U.S.C. § 1677m(d).[14]

---

person with an opportunity to remedy or explain the deficiency in
light of the time limits established for the completion of [the]
investigation[]."  19 U.S.C. § 1677m(d).  See infra pp. 32-33.

[13]Section 1677m(e) provides:

> (e) Use of Certain Information
>
> In reaching a determination under . . . this title the
> administering authority . . . shall not decline to
> consider information that is submitted by an interested
> party and is necessary to the determination but does
> not meet all the applicable requirements established by
> the administering authority . . . if –
>
> (1)  the information is submitted by the deadline
>      established for its submission,
> (2)  the information can be verified,
> (3)  the information is not so incomplete that it
>      cannot serve as a reliable basis for reaching the
>      applicable determination,
> (4)  the interested party has demonstrated that it
>      acted to the best of its ability in providing the
>      information and meeting the requirements
>      established by the administering authority . . .
>      with respect to the information, and
> (5)  the information can be used without undue
>      difficulties.

19 U.S.C. § 1677m(e).

[14]Section 1677m prevents Commerce's unrestrained use of
facts available as to a firm that makes its best efforts to
cooperate with the Department. Borden, Inc. v. United States, 22
CIT 233, 262, 4 F. Supp. 2d 1221, 1245 (1998), aff'd sub nom.
F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United
States, 216 F.3d 1027 (Fed. Cir. 2000) ("Borden I").  This
section was enacted as a part of the URAA, Pub. L. 103-465, §

If Commerce finds that an interested party failed to provide requested information by the deadline or in the form and manner requested, Commerce's use of facts available is subject to 19 U.S.C. § 1677m(c)(1) and (e).   19 U.S.C. § 1677e(a)(2)(B). Subsection (e) requires Commerce to consider deficient information if the respondent satisfies five enumerated criteria.  See supra note 13.   Subsection (c) requires a party to promptly notify Commerce as to why it cannot comply with the agency's questionnaire.   19 U.S.C. § 1677m(c)(1).[15]   That subsection also

---

231, to implement portions of Annex II to the Antidumping Agreement, which states, in relevant part, that information which "may not be ideal," should not be disregarded if the party "has acted to the best of its ability."  Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, Annex II para. 5, reprinted in U.S. Trade Representative, Final Texts of the GATT Uruguay Round Agreements 168 (1994).

[15]Title 19 U.S.C. § 1677m(c) states as follows:

   (c) Difficulties in meeting requirements

   (1)  Notification by interested party

        If an interested party, promptly . . . notifies the administering authority . . . that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority . . . shall consider the ability of the interested party to submit the information . . . and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.

   (2)  Assistance to interested parties

        The administering authority . . . shall take into account any difficulties experienced by interested

requires parties to suggest alternative forms in which they are able to comply with the request.  Id.

In the instant case, neither China Steel nor Yieh Loong individually contest Commerce's efforts to comply with § 1677m(d) prior to the preliminary determination in which the two entities were collapsed.  Put differently, Plaintiff concedes that Commerce, in accordance with § 1677m(d), promptly informed each entity of their respective deficiencies by issuing supplemental questionnaires requesting the deficient information.  See Pl.'s Br. at 22; see also Letter from Robert James, Program Manager, Int'l Trade Admin., to China Steel Corporation, c/o Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., C.R. Doc. 22, Def.'s Conf. Ex. 3 (Feb. 27, 2001); YL's Questionnaire II, P.R. Doc. 69, Def.'s Ex. 2.  At the point at which Commerce collapsed China Steel and Yieh Loong, the two companies were no longer treated as separate legal entities.  Rather, China Steel and Yieh Loong collectively constituted a single "producer"[16] pursuant to 19 U.S.C. § 1677(28)

---

parties, particularly small companies, in supplying information requested by the administering authority . . . in connection with investigations and reviews under this subtitle, and shall provide to such interested parties any assistance that is practicable in supplying such information.

19 U.S.C § 1677m(c).

[16]Title 19 U.S.C. § 1677(28) defines the term "exporter" or "producer" as the "exporter of the subject merchandise, the producer of the subject merchandise or both where appropriate."

for purposes of conducting the antidumping investigation and calculating a dumping margin.  Final Determ., 66 Fed. Reg. at 49,620; see also Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,330 (Dep't Commerce Feb. 27, 1996) (proposed rule) (stating that upon collapsing multiple separate legal entities, Commerce treats the selected entities as a single entity for calculation of a single weighted-average dumping margin).  As a result, Yieh Loong is not entitled to separately receive notice or remedial opportunities after the two entities were collapsed, as Yieh Loong is not an individual or separate producer in the investigation.  Thus, the Court finds Commerce's actions consistent with § 1677m(d).[17]

To support its second argument, its § 1677m(c)(1) contention, Plaintiff points to responses indicating that it coded the requested product characteristics data in new columns because such information lacks "specific record."  CSC's Feb. 26 Response, C.R. Doc. 17, Pl.'s Conf. Ex. 3 at 5-6.  With respect to the downstream

---

[17]Plaintiff also contends that Commerce failed to again provide it notice and an opportunity to remedy its deficiencies prior to applying adverse facts available.  See Pl.'s Br. at 22.  Plaintiff's argument is based on a misinterpretation of the statute.  As described above, Commerce is only required to provide notice of deficient responses and an opportunity to remedy those deficiencies prior to applying facts available in accordance with 19 U.S.C. §§ 1677(e)(a), 1677m(d).  Commerce may not apply adverse facts available until it has complied with the requirements for applying facts available.  Compare 19 U.S.C. § 1677e(a) with 19 U.S.C. § 1677e(b).  Thus, Commerce is not again required to extend notice and remedial opportunities after reaching its facts available determination.

sales information, Plaintiff points to responses indicating that it "had pushed hard to get [YH] to fully report its resale data," and that YH was unable to submit complete data because of financial cutbacks. CSC's Apr. 10 Letter, C.R. Doc. 43, Pl.'s Conf. Ex. 8 at 2.

Plaintiff's two responses do not meet the threshold requirements of 19 U.S.C. § 1677m(c)(1), as Plaintiff neither explains in detail the difficulties it experienced, nor suggests alternatives for supplying the deficient information. Compare Kawasaki Steel Corp. v. United States, 24 CIT 684, 691, 110 F. Supp. 2d 1029, 1036 (2000) (holding that respondent failed to provide a full explanation why requested information could not be submitted and failed to suggest alternatives for providing such information where the respondent simply asked to be excused from answering a section of the questionnaire) with World Finer Foods, Inc. v. United States, 24 CIT 541, 542-44 (2000) (holding that respondent Arrighi provided a detailed explanation in accordance with § 1677m(c) when the company explained to Commerce that it ceased exportation of pasta to the United States and was unable to submit full responses to the agency's questionnaire because the company was not financially in a position to spare personnel to compose such responses, and then offered to supply limited information the Department might find worthwhile or helpful).

In fact, the record suggests that Plaintiff was capable of

complying with the Department's requests, because Plaintiff asked for numerous extensions of time in order to collect and submit the requested information. E.g., Final Determ., 66 Fed. Reg. at 49,620 (stating that Plaintiff "repeatedly told the Department that the missing information would be forthcoming"); Supplemental Section B Response from China Steel Corporation before the Int'l Trade Admin., P.R. Doc. 92, Def.-Int. II's Ex. 6 para. A3,(seeking an extension of time to file the deficient downstream sales information with Plaintiff's supplemental section D responses), A4 (indicating that product characteristics such as "overrun, prime, carbon, yield strength etc. can be identified from the production record, inventory record as well as the product code system . . . while . . . paint, thickness, width, cut-to-length, pickled, edge trim and patterns in relief can be identified with customers' orders") (Apr. 3, 2001); Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, C.R. Doc. 52, Pl.'s Conf. Ex. 10 at 5-6 (Apr. 23, 2001) ("CSC's Apr. 23 Response") (describing Plaintiff's efforts to collect the information and expressly requesting the opportunity "to refine the data submitted before making the final determination"). Moreover, Plaintiff also claims that it ultimately, albeit tardily, submitted all of the deficient data. See Pl.'s Br. at 30.

Because Plaintiff failed to provide a full, detailed

explanation and suggest alternatives for providing the information, however, the Court finds Commerce's duty to "assist interested parties experiencing difficulties" was not triggered. World Finer Foods, 24 CIT at 544 (internal citation omitted).

Contrary to Plaintiff's third argument, Commerce ultimately rejected Plaintiff's submitted responses because it failed to provide complete product characteristics and accurate downstream sales information. See Final Determ., 66 Fed. Reg. at 49,620-21. Commerce concluded that Plaintiff's submitted data were "too incomplete to form a reliable basis for making a determination" pursuant to 19 U.S.C. § 1677m(e)(3). Id. at 49,620. Without the requested data, Commerce stated that it was unable to calculate an accurate margin, nor could it use China Steel's home market database to match sales of identical or most similar products, compare prices of the merchandise, or properly perform a cost test for home market sales. Id. at 49,622. Because Commerce is charged with calculating dumping margins "'as accurately as possible,'" Lasko Metal Prods. Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (quoting Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)), and because the agency was inhibited from doing so without the requested information, the Court finds Commerce's decision to apply facts available in accordance with

law.[18]


### C. Adverse Facts Available

The third issue concerns Commerce's application of adverse facts available. The Department concluded that Plaintiff "has not cooperated by acting to the best of its ability." Final Determ., 66 Fed. Reg. at. 49,620-21. Commerce reached this conclusion because China Steel repeatedly ignored instructions to submit complete product characteristics and accurate downstream sales data, and "never provided alternatives or reasonable explanations for why it could not report all downstream sales." Id. at 49,622. This information was necessary to calculate an accurate margin, to match sales of identical or most similar products, and to perform a cost test for home market sales. Id. Commerce also noted that Plaintiff "repeatedly told the Department that the missing information would be forthcoming." Id. at 49,620. As CSC/YL's deficient responses affected a "significant" portion of its responses, Commerce found the submitted data unusable for purposes of calculating a margin. Id. at 49,622. Commerce therefore determined that the application of adverse facts available was

---

[18]Although Commerce also concluded that Plaintiff failed to act to the best of its ability, Final Determ., 66 Fed. Reg. at 49,620-21, the Court will address that issue in subsection C below, discussing adverse inferences. Regardless, as Plaintiff has not demonstrated that all five of the elements contained in § 1677m(e) are satisfied, the Department's decision to apply facts available is reasonable. See 19 U.S.C. § 1677m(e).

appropriate under 19 U.S.C. § 1677e(a)(2)(B), 1677e(b).  Id.

Plaintiff challenges Commerce's decision to apply adverse facts available as unsupported by substantial evidence and not in accordance with law, asserting that the agency merely repeated that Plaintiff had problems in timeliness and completeness without finding that its refusal to cooperate was willful.  Pl.'s Br. at 12, 22, 29.  Plaintiff further argues that the Department failed to consider the difficulties Plaintiff experienced in tracing the requested product characteristics data and extracting and collecting the requested affiliate reseller information.  See id. at 13.  Last, Plaintiff contends that Commerce failed to provide it with a meaningful opportunity to respond to the Department's requests for product characteristics and affiliate downstream sales data.  Pl.'s Br. at 23.

Once Commerce determines that facts available is warranted, § 1677e(b) permits Commerce to apply an "adverse inference" if the Department makes an additional finding that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b); see also Fujian Mach. and Equip. Imp. & Exp. Corp. v. United States, 25 CIT __, __, 178 F. Supp. 2d 1305, 1332 (2001) (internal citations omitted).  This finding must be "reached by 'reasoned decisionmaking,' including . . . a reasoned explanation supported by a stated connection between the facts found and the choice made."  Elec.

Consumers Res. Council v. Fed. Energy Regulatory Comm'n, 747 F.2d 1511, 1513 (D.C. Cir. 1984) (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)). Otherwise, "the Department's decision-making process will be arbitrary and capricious." Steel Auth. of India, Ltd. v. United States, 25 CIT __, __, 149 F. Supp. 2d 921, 929 (2001).[19]

In making its determination that an interested party did not act "'to the best of its ability,' [Commerce] cannot merely recite the relevant standard or repeat its facts available finding." Steel Auth. of India, Ltd., 25 CIT at __, 149 F. Supp. 2d at 930 (internal citation omitted); see also Kawasaki Steel Corp., 24 CIT at 689, 110 F. Supp. 2d at 1034 ("It has been well established by the court that a 'mere recitation of the relevant [adverse facts available] standard is not enough for Commerce to satisfy its obligation under the statute.'") (internal citation omitted). Rather, to satisfy its statutory obligations, the Department must be explicit in its reason for applying adverse inferences. See Ferro Union, Inc., 23 CIT at 200, 44 F. Supp. 2d at 1331. For the

---

[19]The Court considers not only the Department's interpretation of the statute, but its decision-making process as well. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42-43 (1983) (describing the role of rationality in reviewing an agency's decision-making process).

This review differs from Chevron review in that it focuses on whether the Department "articulate[d] with reasonable clarity its reasons for decision[,]" rather than on the reasonableness of the Department's statutory interpretation. Steel Auth. of India, Ltd., 25 CIT at __, 149 F. Supp. 2d at 929 n.10 (internal citation omitted) (alterations in original).

Department's decision to be supported by substantial evidence, Commerce must clearly articulate "'why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance to the progress of [the agency's] investigation.'" Nippon Steel Corp. v. United States, 24 CIT 1158, 1170, 118 F. Supp. 2d 1366, 1378 (2000) ("Nippon Steel Corp. I") (quoting Mannesmannrohren-Werke AG v. United States, 23 CIT 826, 839, 77 F. Supp. 2d 1302, 1313-14 (1999)). Commerce's explanation must include, "[a]t a minimum," a determination "that a respondent could comply, or would have had the capability of complying if it knowingly did not place itself in a condition where it could not comply." Nippon Steel Corp. I, 24 CIT at 1171, 118 F. Supp. 2d at 1378-79 (internal citation omitted). Furthermore, Commerce "must also find either a willful decision not to comply or behavior below the standard for a reasonable respondent." 24 CIT at 1171, 118 F. Supp. 2d at 1379.

Here, Commerce appears to conclude that Plaintiff could comply with the agency's requests. Final Determ., 66 Fed. Reg. at 49,620-21 (noting that Plaintiff "repeatedly told the Department that the missing information would be forthcoming" and that Plaintiff failed to provide any proof that it was unable to comply with the requests); see also Bowman Transp., Inc., 419 U.S. at 286 (holding that the Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

Commerce's decision, however, failed to make the required additional finding that Plaintiff failed to act to the best of its ability.  Commerce neglected to explain or analyze whether Plaintiff willfully decided not to comply with its requests, or alternatively, whether Plaintiff's behavior fell below the standard for a reasonable respondent.  See Nippon Steel Corp. I, 24 CIT at 1170-71, 118 F. Supp. 2d at 1378-79.  Instead, Commerce supports its use of adverse facts available by repeating its facts available reasoning, although using slightly different words.  Compare Final Determ., 66 Fed. Reg. at 49,622 (finding that China Steel failed to cooperate to the best of its ability because it repeatedly ignored the agency's instructions to submit downstream sales and product characteristics data, and never provided alternatives or explanations for why it could not report the information) with id. at 49,620-21 (holding that use of facts available was proper because Plaintiff withheld and failed to supply downstream sales and product characteristic information requested by the Department without seeking modification of the reporting requirements).  In so doing, Commerce conflates the prerequisites for use of facts available with the additional findings required to use an adverse inference.  See Nippon Steel Corp. v. United States, 25 CIT __, __, 146 F. Supp. 2d 835, 840 (2001) ("Commerce may not in this manner 'simply repeat[] its 19 U.S.C. § 1677e(a)(2)(B) finding, using slightly different words,' in lieu of making the requisite

additional findings before drawing an adverse inference.") (citing Borden I, 4 F. Supp. 2d at 1246); see also Steel Auth. of India, Ltd., 25 CIT at __, 149 F. Supp. 2d at 930; Kawasaki Steel Corp., 24 CIT at 689, 110 F. Supp. 2d at 1034 (internal citations omitted). The Court therefore finds the Department's "best of ability" determination not in accordance with law. See Steel Auth. of India, Ltd., 25 CIT at __, 149 F. Supp. 2d at 930-31.

The Department's "best of ability" determination fails for an additional reason. In its Case Brief before Commerce, Plaintiff described the difficulties it experienced in gathering and submitting the requested information. Case Brief, P.R. Doc. 140, Pl.'s Ex. 14 at 2-3 (stating that "the case is highly complex, involving over 100,000 transactions from nine separate sales data bases, about three million individual figures," and multiple tracings through up to 70 transactions for requested product characteristics). The Department, however, fails to address this claim in reaching its "best of ability" determination. As "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" Commerce failed to clearly identify its reasons for discounting Plaintiff's claims in making its best of ability determination. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (internal citation omitted).

CSC/YL's last argument contends that Commerce failed to afford

Plaintiff a meaningful opportunity to respond to the agency's requests to submit the data in question. Generally, Commerce affords interested parties at least 30 days to respond to the full initial questionnaire from the date of receipt. 19 C.F.R. § 351.301(c)(2)(iii). Notwithstanding that regulation, our case law has established that "parties must be given a reasonable and meaningful opportunity to participate in the review and provide complete responses." Mitsui & Co. v. United States, 18 CIT 185, 202 (1994) (internal citation omitted).

In Am. Silicon Tech. v. United States, 24 CIT 612, 624-25, 110 F. Supp. 2d 992, 1003 (2000), the Court found that Commerce's use of adverse facts was inappropriate because it was "not clear" that the "numerous opportunities" afforded to respondent Eletrosilex were meaningful opportunities to respond. The Department in that case issued an initial questionnaire and a supplemental questionnaire, to which Eletrosilex responded promptly. 24 CIT at 620, 110 F. Supp. 2d at 998-99. Thereafter, Commerce sought additional information on "certain topics" by issuing a second and third questionnaire that required responses within one week of issuance, because of the statutory deadline for filing the preliminary decision. 24 CIT at 620, 110 F. Supp. 2d at 999. Eletrosilex failed to respond to either supplemental questionnaire. Id. Instead, the respondent informed the Department that it was being acquired, and that it was unable to file timely responses to

the supplemental questionnaires because of management reviews and changes in staffing.  Id.  The Court found that it was unclear whether Plaintiff was afforded a meaningful opportunity to respond, because the questionnaires required responses within one week of issuance in light of the approaching preliminary determination deadline, and Eletrosilex notified the agency upon receipt of the questionnaires that it was being acquired and that it was unable to submit timely responses because of management reviews and staffing changes.  24 CIT at 624-25, 110 F. Supp. 2d at 1002-03.

Similarly, in Mitsui & Co., 18 CIT at 202, the Court held that Commerce failed to afford respondent a meaningful opportunity to respond to the Department's requests because the agency requested 5 years of information to be submitted in 83 days, and the Department failed to provide the respondent notice of the alleged deficiencies in its submission.  The Court in Melex USA, Inc. v. United States further held that Commerce's resort to "best information available"[20] was not in accordance with law because the respondents were expected to submit data covering several years of sales which occurred over ten years before the initiation of the investigation, and the Department failed to give some indication

[20]The "best information available" ("BIA") standard preceded the current "facts available" standard.  See Ferro Union, Inc., 23 CIT at 198 n.41, 44 F. Supp. 2d at 1329 n.41.  Pursuant to the URAA, Pub. L. No. 103-465, 108 Stat. 4809 (1994), the terminology was changed, and the Department was instructed to make more discriminating judgments then previously mandated under the BIA standard.  Id.

whether the information submitted satisfied the agency's requests. See 19 CIT 1130, 1142, 899 F. Supp. 632, 642 (1995) (indicating the investigation was initiated in April 1991 for the period of July 1, 1976 through June 10, 1980).

The instant case, however, is factually dissimilar from our "meaningful opportunity" jurisprudence. Here, it is undisputed that Commerce notified Plaintiff of its deficient Questionnaire I responses. Thereafter, Commerce continued to seek the same product characteristics and downstream sales data, providing Plaintiff with notice of deficiencies and issuing repeated supplemental questionnaires. Even though Plaintiff was only given several days to complete Commerce's Questionnaires II and III, Plaintiff, in fact, received a total of more than four months to respond to Commerce's request for data describing sales which occurred within the same year of the Department's initiation of the antidumping investigation. The Court therefore finds that Commerce afforded Plaintiff a meaningful opportunity to respond to the Department's requests.

Accordingly, the Court remands Commerce's adverse facts available decision so that the Department may make specific findings as to whether CSC/YL willfully decided not to cooperate or behaved below the standard of a reasonable respondent, or otherwise reconsider its decision to apply an adverse inference in choosing

the available data to calculate the dumping margin.[21]


**D. Additional Arguments Contesting Commerce's Application of Adverse Facts Available**

### 1. "Overrun" Product Characteristics

Plaintiff also argues that Commerce may not resort to adverse facts available because the missing product characteristics data are "insignificant or irrelevant." Pl.'s Br. at 6. Plaintiff asserts three arguments in support of its contention. First, Plaintiff challenges Commerce's conclusion that the "leeway overrun" merchandise in question is "prime quality merchandise," which should be matched to U.S. sales, as unsupported by substantial evidence. Id. at 9. Plaintiff's second argument is that its "leeway overrun" merchandise is sold outside the ordinary course of trade.[22] Id. at 8. Third, Plaintiff argues that the "leeway overrun" merchandise in question is sold only in the home market, and as such, the Department should have excluded that

---

[21]Plaintiff also claims that Commerce failed to corroborate the selected adverse facts available margin. Pl.'s Br. at 31. Because the Court remands this matter for reconsideration of the inferences drawn adversely against Plaintiff, any ruling on the corroboration of the adverse facts available dumping margin would be premature.

[22]"Ordinary course of trade," a variable considered in calculating normal value, is defined by 19 U.S.C. § 1677(15) as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind."

merchandise from use in calculating the dumping margin in accordance with agency practice. Id. at 6-7.

The Department's questionnaires do not request product characteristics data for "leeway overrun" products. Instead, the agency sought product characteristic data for all products Plaintiff classifies as "leeway" merchandise and specifically for Plaintiff's "overrun" merchandise. See, e.g., CSC's Questionnaire II, C.R. Doc. 27, Def.-Int. II's Conf. Ex. 3 supp. questionnaire para. 5; YL's Questionnaire II, P.R. Doc. 69, Def.'s Ex. 2 supp. questionnaire para. 2. Commerce defines "overrun" merchandise as "excess production from [a] particular purchase order, regardless of the manner in which [the product] is ultimately sold." Id.

In the normal course of business, Plaintiff, however, does not appear to individually catalogue data for overrun merchandise. Rather, Plaintiff classifies overrun as a possible source of "leeway" merchandise, because that product lacks a purchase order. CSC's Feb. 26 Response, C.R. Doc. 17, Pl.'s Conf. Ex. 3 at 3. "Leeway" merchandise derives from four possible sources, according to Plaintiff, including: (1) overrun, (2) prime products that do not meet customers' original specifications, (3) prime products produced after cancelled orders, and (4) newly developed products. CSC'S Apr. 3 Response, C.R. Doc. 39, Pl.'s Conf. Ex. 6 para. 5. In one questionnaire response, Plaintiff describes "leeway" merchandise as both prime and non-prime quality merchandise, id.

para. 6, while at various other places in the record, Plaintiff insists that "leeway" products are prime quality. CSC's Mar. 20 Response, C.R. Doc. 31, Pl.'s Conf. Ex. 4 at 24 (indicating that "[i]rregular miscellaneous leeway" product is "prime finished goods" and that such product "would be reported as overrun prime in the sales listings"); CSC's Apr. 3 Response, C.R. Doc. 39, Pl.'s Conf. Ex. 6 para. 5; CSC's Apr. 23 Response, C.R. Doc. 52, Pl.'s Conf. Ex. 10 at 5. With regards to overrun merchandise, CSC/YL defines overrun as excess production that is either non-prime or prime quality merchandise. See Pl.'s Br. at 5; Letter from Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, C.R. Doc. 39, Pl.'s Conf. Ex. 6 para. 5-6 (Apr. 3, 2001) ("CSC's Apr. 3 Response"). Plaintiff also stated in CSC's Apr. 3 Response that a substantial percentage of the overrun merchandise in question is prime quality. CSC's Apr. 3 Response, C.R. Doc. 39 para. 7.

Here, Commerce concluded that contrary to Plaintiff's characterization of the subject merchandise as "leeway" sales, "the merchandise in question is not 'secondary' quality merchandise which should not be matched to prime quality merchandise. The merchandise in question is prime quality; it has simply not been purchased by the customer to whose specifications it was originally produced." Final Determ., 66 Fed. Reg. at 49,621. In other words, as a result of excess production, the merchandise is sold to other

customers from Plaintiff's inventory.  Id.

Commerce's determination that the merchandise in question is prime quality is supported by substantial evidence.  While the record indicates that overrun merchandise may be either prime or non-prime quality merchandise, it clearly indicates that a substantial percentage of the overrun merchandise in question is prime quality.  Moreover, the record reveals Plaintiff only once stated that "leeway" merchandise, a category which contains the overrun merchandise in question, is either prime or non-prime quality merchandise; in all other instances, the record indicates that "leeway" merchandise is prime quality.  For these reasons, the Court finds Commerce's determination is supported by substantial evidence.

With regards to Plaintiff's second argument contending that leeway overrun merchandise is outside the ordinary course of trade, Commerce responds that the Court should decline to review this argument because Plaintiff failed to exhaust its administrative remedies.  Def.'s Mem. at 29.  The Court will address the agency's argument first.

"The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court."  Timken Co. v. United States, 26 CIT __, __, 201 F. Supp. 2d 1316, 1340 (2002) (internal citation omitted).  There is, however, "no

absolute requirement of exhaustion in the Court of International Trade in non-classification cases." Consol. Bearings Co. v. United States, 25 CIT __, __, 166 F. Supp. 2d 580, 586 (2001) (internal citation omitted). Rather, Congress vested the Court with discretion to determine the circumstances under which it is appropriate to require the exhaustion of administrative remedies pursuant to 28 U.S.C. § 2637(d).

> While a plaintiff cannot circumvent the require-
> ments of the doctrine . . . by merely mentioning a broad
> issue without raising a particular argument, plaintiff's
> brief statement of the argument is sufficient if it
> alerts the agency to the argument with reasonable clarity
> and avails the agency with an opportunity to address it.

Luoyang Bearing Factory v. United States, 25 CIT __, __, 240 F. Supp. 2d 1268, 1297 (2002) (internal citations omitted). The sole fact that the agency failed to address a plaintiff's argument does not invoke the exhaustion doctrine and shall not preclude a plaintiff from seeking judicial relief. Id. at 1298. "An administrative decision not to address the issue cannot be dispositive of the question whether or not the issue was properly brought to the agency's attention." Id.

Here, Plaintiff properly exhausted its administrative remedies. In its Case Brief before the Department, Plaintiff raised its challenge contending that the "leeway overrun" merchandise was sold outside the ordinary course of trade. Specifically, Plaintiff argued that Commerce discards "similar overruns sold at a discount in the dumping margin calculation, as

. . . not in the ordinary course of trade" and cited three agency determinations to support its position. Case Brief, P.R. Doc. 140, Pl.'s Ex. 14 at 7.  Even though Plaintiff's statement of its position was brief, Plaintiff articulated its "ordinary course of trade" challenge with reasonable clarity, and provided the Department with an opportunity to address that argument in the final determination.  Thus, the Court finds that Plaintiff has properly presented its claim here.  Cf. NSK Ltd. v. United States, 25 CIT __, __, 170 F. Supp. 2d 1280, 1291 (2001) (finding that respondent NSK sufficiently exhausted its administrative remedies by bringing forth the issue in its case brief before Commerce). The Court now turns to the merits of Plaintiff's second contention.

In calculating the antidumping margin, Commerce generally excludes home market sales of overrun merchandise from U.S. sales comparisons where the agency determines that the overrun merchandise is sold outside the ordinary course of trade.  E.g., Certain Cut-to-Length Carbon-Quality Steel Plate Products from Italy, 64 Fed. Reg. 73,234, 73,236-37 (Dep't Commerce Dec. 29, 1999) (notice of final determination of sales at LTFV); Certain Steel Products from Brazil, 64 Fed. Reg. at 38,771.  In evaluating whether sales of overrun merchandise are outside the ordinary course of trade, the agency typically examines all of the circumstances particular to the sales in question.  See, e.g., Certain Steel Products from Brazil, 64 Fed. Reg. at 38,770.  For

example, the agency has considered several factors, no one of which is dispositive, including: (1) an average price comparison between an overrun sale and a commercial sale; (2) a comparison between the ratio of overrun sales to total home market sales; (3) the volume of sales and number of buyers in the home market; (4) whether the merchandise is "off-quality" or produced according to unusual specifications; (5) whether the merchandise is sold at unusually high profits or according to unusual terms of sale; or (6) whether the merchandise is sold to affiliated parties at non-arm's length prices. Id.; Mantex, Inc. v. United States, 17 CIT 1385, 1403, 841 F. Supp. 1290, 1305-06 (1993); Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 65 Fed. Reg. 76,218, 76,221 (Dep't Commerce Dec. 6, 2000) (preliminary results and rescission in part of antidumping administrative review). It follows that Commerce would be unable to determine whether a producer's overrun sales were sold outside the ordinary course of trade until the agency has actually evaluated the producer's complete overrun sales data. See id.

The Department here could not conduct such an examination of Plaintiff's overrun merchandise. Because Plaintiff failed to submit complete product characteristics data, Commerce concluded that it was unable to use Plaintiff's submissions to conduct price comparisons and accurately compute a dumping margin. Final Determ., 66 Fed. Reg. at 49,621. In other words, without the

products characteristics data, the agency was unable to consider all of the circumstances particular to Plaintiff's overrun sales to determine whether those sales were sold outside the ordinary course of trade.  Moreover, the agency's inaction is consistent with its obligation to calculate accurate dumping margins.  Lasko Metal Prods. Inc., 43 F.3d at 1446 (quoting Rhone Poulenc, Inc., 899 F.2d at 1191).  The Court therefore finds that Commerce's failure to make an ordinary course of trade determination was reasonable.

The Court finds Plaintiff's third argument unpersuasive.  As evidence of the Department's practice to exclude home market overrun sales from the dumping margin where a producer has no U.S. overrun sales, CSC/YL incorrectly cites to Certain Steel Products from Brazil, 64 Fed. Reg. at 38,770-71.[23]  Pl.'s Br. at 7.  In that determination, Commerce concluded that, although producer CSN's home market overruns were sold only in the home market, and represented "such an insignificant portion" of CSN's total home

---

[23]Plaintiff also cites to Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 64 Fed. Reg. 24,329, 24,341 (Dep't Commerce May 6, 1999) (notice of final determination of sales at LTFV) for support of its contention.  Pl's Br. at 7. The Department in that determination found that the producer's home market overrun merchandise was outside the ordinary course of trade and should be excluded from the dumping margin for three reasons.  Id.  One of those reasons included the fact that the Department found sufficient matches of U.S. and home market non-overrun prime merchandise sold in the ordinary course of trade. Id.  The agency, however, did not find, nor does the determination suggest, that the overrun sales were excluded from the margin because the producer had not sold any overrun merchandise in the U.S.  See id.  Therefore, the Court finds this determination unsupportive of Plaintiff's contention.

market sales during the period of investigation that the data's effect on the margin was negligible, the merchandise did not warrant exclusion from the home market database. 64 Fed. Reg. at 38,771. Because none of the factors the Department considers in determining whether overrun sales are outside the ordinary course of trade were germane to the producer's overrun sales, Commerce decided to include the overrun sales data. Id.

It can reasonably be inferred, however, that the agency's decision in Certain Steel Products from Brazil was based on its evaluation and verification of complete overrun sales information. See id. Accordingly, the instant case is factually distinguishable. The agency here neither found that the missing overrun sales were only sold in the home market, nor that those sales constituted "such an insignificant portion" of CSC/YL's home market sales that the merchandise's effect would be "negligible." Certain Steel Products from Brazil, 64 Fed. Reg. at 38,771; Final Determ., 66 Fed. Reg. at 49,621 (indicating that the missing product characteristics data affected a "significant" portion of China Steel's home market sales and that such merchandise could be matched to U.S. sales). More importantly, unlike Certain Steel Products from Brazil, CSC/YL failed to provide complete overrun sales information during the investigation, which resulted in Commerce's inability to consider whether those sales were made only in the home market, and consequently, outside the ordinary course

of trade.  See supra pp. 51-53.  For these reasons, the Court finds that Commerce's decision to include the overrun sales in the dumping margin was in accordance with law.

### 2. Downstream Sales Data

Plaintiff raises two additional arguments supporting its contention that Commerce erroneously used adverse facts available with respect to the downstream sales data.  Plaintiff first argues that Commerce erred because its total home market sales to affiliates do not meet the five percent threshold required in 19 C.F.R. § 351.403(d), and thus, the missing affiliate reseller data would not be used in calculating the dumping margin.  See Pl.'s Br. at 19.  Plaintiff's second argument contends that the agency failed to consider whether the sales to the affiliates were arm's length transactions pursuant to 19 C.F.R. § 351.403(c),(d) and agency practice.  See Pl.'s Br. at 18-19.  Plaintiff argues that Commerce should have made this decision prior to requesting the affiliate downstream sales information.  Id. at 19.

With regards to CSC/YL's first argument, Commerce "normally will not calculate normal value based on the sale by an affiliated party if sales of the foreign like product by an exporter or producer to affiliated parties account for less than five percent of the total value (or quantity) of the exporter's or producer's sales."  19 C.F.R. § 351.403(d).  Here, the agency concluded that

"China Steel's sales to affiliates constituted approximately one-fifth of its total home market sales;" particularly, Commerce determined that sales to Yieh Loong, YH, and YP constituted more than five percent of China Steel's home market sales, or a "significant percentage." Final Determ., 66 Fed. Reg. at 49,621-22; see also Dep't of Commerce Mem. from Patricia Tran, Dep't Commerce to File, The Use of Adverse Facts Available for China Steel Corporation (China Steel) and Yieh Loong Enterprise Co., Ltd. (Yieh Loong), C.R. Doc. 55, Def.'s Conf. Ex. 7 at 5-6 (Apr. 23, 2001). Commerce, however, included Yieh Loong in its affiliate reseller calculation, even though that entity was collapsed with China Steel. As discussed above in subsection B, once the two entities are collapsed, Commerce must treat them as a single producer for purposes of calculating the dumping margin. See supra pp. 32-33. Because Yieh Loong's sales were included in the calculation, Commerce's determination may have been erroneous, and the Court is unable to review that determination. Accordingly, the Court remands this issue to Commerce for reconsideration.

The Court finds Plaintiff's second argument lacks merit. The plain language of the regulation indicates that Commerce may calculate normal value based on affiliate reseller data, although the Department normally will not do so if the exporter's or producer's sales to affiliates constitute less than 5 percent of its home market sales or were arm's length transactions. 19 C.F.R.

§ 351.403(d) (emphasis supplied).  Further, the Department <u>may</u>
calculate normal value based on sales to affiliates if the agency
is satisfied that the transactions were made at arm's length.  <u>See</u>
19 C.F.R. § 351.403(c) (emphasis supplied).[24]  Thus, Commerce has
discretion to calculate normal value pursuant to subsections (c)
and (d).  Neither the regulations nor the Department's practice,
however, support Plaintiff's contention that Commerce is required
to conduct an arm's length test prior to requesting affiliate
reseller data.  Rather, it seems that the agency could not conduct
an arm's length test without first receiving the requisite
affiliate reseller data.  Thus, Commerce's failure to conduct an
arm's length test prior to requesting affiliate reseller data in
the instant case was permissible.

### 3. World Trade Organization Obligations

#### a. 19 U.S.C. § 3512

As a preliminary matter, Commerce argues that 19 U.S.C. §
3512(c) prohibits Plaintiff, as a private party, from challenging
any government action brought under any provision of law as
inconsistent with any of the World Trade Organization ("WTO")

---

[24]19 C.F.R. § 351.403(c) states that the "[i]f an exporter
or producer sold the foreign like product to an affiliated party,
the [Department] may calculate normal value based on that sale
only if satisfied that the price is comparable to the price at
which the exporter or producer sold the foreign like product to a
person who is not affiliated with the seller."  19 C.F.R. §
351.403(c).

Agreements.  See Def's Mem. at 31-32.  As the Court determined in Timken Co. v. United States, 26 CIT __, __, 240 F. Supp. 2d 1228, 1238 (2002) ("Timken I"), Plaintiff is not bringing this action under any WTO agreement; instead, Plaintiff argues that Commerce's application and interpretation of U.S. law violates its international obligations pursuant to a WTO agreement.

CSC/YL is certainly "'free to argue that Congress would never have intended to violate an agreement it generally intended to implement, without expressly saying so.'"  Timken I, 26 CIT at __, 240 F. Supp. 2d at 1238 (quoting Gov't of Uzbekistan v. United States, slip. op. 01-114 at 11 (CIT Aug. 30, 2001)).  As in those two cases, Commerce's reliance here on § 3512(c) is an "'erroneous technical bar.'"  Id.  Therefore, Plaintiff's arguments are properly before the Court.

### b. WTO Panel Reports

Plaintiff argues that Commerce's application of adverse facts available violates U.S. obligations to the WTO, rendering its decision not in accordance with law.  Pl.'s Br. at 14, 23.  With respect to the product characteristics data, Plaintiff argues that for Commerce to "demand all this [data], and to require that it all be perfect under penalty of hair-trigger application of '[facts available]' within significantly accelerated deadlines, is the epitome of unreasonable government action."  Id. at 14 (citing WTO

Dispute Settlement Report on <u>United States – Anti-Dumping Measures on Certain Hot-Rolled Steel Products from Japan</u>, 29 Bernan's Annot. Rep. 163 (Feb. 28, 2001) ("<u>Certain HR Products from Japan</u>")).[25]

Plaintiff's reliance on <u>Certain HR Products from Japan</u>, however, is misplaced, as the Panel in that case did not find that the Department "unduly accelerated the proceeding" in violation of U.S. international obligations. 29 Bernan's Annot. Rep. at 85-86. Rather, the Panel held that it "simply [could] not see any basis on which to find that [Commerce] failed to administer the anti-dumping law in a uniform, impartial, and reasonable manner simply because [the agency] chose to act faster than it normally did in issuing the questionnaires in this investigation." <u>Id.</u> at 86. Put differently, the Panel held the Department's 25-day acceleration of the investigation in accordance with law. <u>Id.</u>

Similarly, the Court does not find Commerce's requests for product characteristics data in the time frame at issue here to be "unreasonable government action." Unlike <u>Certain HR Products from Japan</u>, here, Commerce did not significantly accelerate the deadlines for initiating the investigation, issuing its initial questionnaire, and rendering a preliminary and final determination.

_____

[25]Plaintiff further argues that a respondent cooperates to the best of its ability when the respondent asks a third-party to cooperate and that party fails to do so, even if the respondent could have done more to induce the third-party's cooperation. Pl.'s Br. at 23. Because the Court found Commerce's "best of ability" determination not in accordance with law in subsection C above, the Court declines to reach this argument.

In particular, the Department initiated the investigation here 21 days after receiving the petition, see Prelim. Determ., 66 Fed. Reg. at 22,204; Initiation Notice, 65 Fed. Reg. at 77,568, whereas in Certain HR Products from Japan, the agency initiated the investigation the day after the petition was filed, or five days earlier than normal. 29 Bernan's Annot. Rep. at 85. Although the Department sent questionnaires to the respondents in Certain HR Products from Japan only four days after initiating the investigation, 29 Bernan's Annot. Rep. at 85, the agency here waited the normal thirty days. See Prelim. Determ., 66 Fed. Reg. at 22,205. As discussed in more detail below in subsection E, Commerce's preliminary determination was made within the statutorily mandated time frame of 140 days, infra pp. 67-68, unlike the Department's actions in Certain HR Products from Japan, in which a preliminary decision was rendered 120 days after the initiation of the investigation. 29 Bernan's Annot. Rep. at 85. Rather than accelerating the deadline for the final determination, the Department here postponed its final determination an additional 60 days beyond the statute's prescribed 75 days. Postponement Notice, 66 Fed. Reg. at 37,213-14. Accordingly, the Court does not find that Commerce "unduly accelerated the proceeding" in violation of U.S. international obligations, but rather acted in conformity with the statutorily mandated norms for instituting, investigating, and rendering a LTFV determination. 19 U.S.C. §§ 1673b(b)(1)(A),

1673b(c), 1673d(a)(2).

### E. Commerce's Conduct during the Investigation

The final issue concerns Commerce's actions in conducting the investigation. Plaintiff raises three arguments. First, Plaintiff contends that Commerce abused its discretion in rejecting its May 30-31, 2001 submission, which allegedly provided all deficient affiliate downstream sales and product characteristics information, in addition to its response to the agency's verbal, post-preliminary determination request for warranty costs on a transaction-specific basis for over 100,000 sales. See Pl.'s Br. at 24-25. This new information in particular, Plaintiff contends, should not have been rejected, as the agency never provided a deadline for its submission. Id. at 25. Thus, Plaintiff contends that Commerce's actions were not in accordance with law. Id.

Next, Plaintiff argues that Commerce's conclusion that the agency had insufficient time to use CSC/YL's May 30-31, 2001 submission in calculating the dumping margin within the postponed time frame for rendering the final determination is inconsistent with its prior statement that the agency would analyze Plaintiff's April 23 Responses and make its final decision within 75 days of the publication of the preliminary decision. Therefore, Plaintiff argues that Commerce's claim is unsupported by substantial evidence and not in accordance with law. See Pl.'s Br. at 25-26. Plaintiff

relies on ALTX, Inc. v. United States, 25 CIT __, __, 167 F. Supp. 2d 1353, 1363 (2001) for the proposition that Commerce "may not reach inconsistent conclusions as to different points in the investigation." Pl.'s Br. at 26.

Third, Plaintiff claims that Commerce unnecessarily limited the investigation time frame in this case. According to CSC/YL, Commerce should have postponed the preliminary determination an additional 50 days to allow sufficient time for the questionnaire process to lead to an accurate dumping margin in this "extraordinarily complicated" case. Pl.'s Br. at 26-27.

With respect to Plaintiff's first contention, the regulations clearly state that a submission of factual information is due no later than 7 days before verification is scheduled in final antidumping determinations. 19 C.F.R. § 351.301(b)(1). "[A]t any time prior to [that] deadline," however, any interested party "may submit factual information to rebut, clarify, or correct factual information submitted by any other interested party." 19 C.F.R. § 351.301(c)(1). The Department, moreover, may request any party to submit factual information at any time during the proceeding. 19 C.F.R. § 351.301(c)(2)(I). The regulations do not govern Commerce's issuance of verbal requests, but the case law establishes that "the administrative record is limited to the information that was presented to or obtained by the agency making the determination during the particular review proceeding for which

section 1516 authorizes judicial review." <u>Neuweg Fertigung GmbH v. United States</u>, 16 CIT 724, 726, 797 F. Supp. 1020, 1022 (1992) (internal citations omitted).

Plaintiff's May 30-31, 2001 submission purportedly contains two sets of information: the deficient downstream sales and product characteristics data and warranty costs on a transaction-specific basis for over 100,000 sales. Commerce denied the entire response as untimely, because this submission constituted a new response and would require additional analysis and investigation to properly administer the case. Final Determ., 66 Fed. Reg. at 49,618; Letter from Robert James, Program Manager, Int'l Trade Admin., to China Steel Corporation and Yieh Loong Enterprise Co. Ltd., c/o Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., P.R. Doc. 131, Def.-Int. I's Ex. 15; Issues and Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at 13.

With regards to the product characteristics and downstream sales information, the record reveals that Commerce scheduled verification for Yieh Loong and China Steel to commence on April 30, 2001 and May 7, 2001 respectively. Letter from Neal Halper, Director, Office of Accounting, Int'l Trade Admin., to Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., C.R. Doc. 49 at 1 (Apr. 19, 2001); Letter from Neal M. Halper, Director, Office of Accounting, Int'l Trade Admin., to Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., C.R. Doc. 56 at 1 (Apr. 26, 2001). For

Plaintiff's submission to be timely, Plaintiff should have filed its responses seven days before the commencement of each companies' respective verification.  19 C.F.R. § 351.301(b)(1).  As the submission was filed on May 30-31, 2001, approximately one month after the regulatory deadline for timely submissions, Plaintiff's submission of this factual information was properly rendered untimely and rejected by the agency.

With regards to the warranty costs information, as Commerce may request factual information from any interested party at any time during the proceeding, Commerce properly issued this request. The agency, however, requested the information orally on May 3, 2001 without setting a deadline for its submission.  See Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, P.R. Doc. 138, Pl.'s Ex. 13 at 1-2 (June 21, 2001); Dep't of Commerce Mem. from Patricia Tran to File, Telephone Conversation with Counsel for Yieh Loong Enterprise Co., Ltd. (Yieh Loong) and China Steel Corporation (China Steel), P.R. Doc. 122, Def.-Int. I's Ex. 13 (May 9, 2000). Consequently, Plaintiff could not have made a timely submission of the warranty costs information, as the Department requested that information after the regulatory deadline for filing factual information.  Moreover, Commerce rejected that data as untimely, even though the agency failed to provide a deadline for its submission, and Plaintiff submitted the request within a month of

its verbal issuance.  Accordingly, on these facts, the Court finds that Commerce abused its discretion in rejecting Plaintiff's warranty costs data.  Therefore, the Court instructs the agency to reopen the record for further consideration of the warranty costs data.[26]

Plaintiff's reliance on ALTX, Inc. in support of its second argument is misplaced.  In that case, the International Trade Commission ("ITC") supported its determination that subject import volumes were not significant with a finding that "nonsubject imports were so significant as to have displaced subject imports and the domestic like product," focusing specifically on the latter half of the period of investigation.  25 CIT at __, 167 F. Supp. 2d

---

[26]Plaintiff further contends that Commerce's rejection of the May 30-31, 2001 submission violates Article 6.8 of the WTO Antidumping Code, and is therefore, not in accordance with law, because Plaintiff made that submission in time to allow for its verification and use in the final determination.  Pl.'s Br. at 28-29 (citing Certain HR Products from Japan, 29 Bernan's Annot. Rep. at 28, 33-34).  The instant case, however, is factually dissimilar from Certain HR Products from Japan.  There, because the respondents submitted their questionnaire responses almost two weeks before verification, and because those responses did not present new information, the Panel found that the submissions, although untimely, were made within a reasonable time as required by Article 6.8.  Certain HR Products from Japan, 29 Bernan's Annot. Rep. at 28 (indicating that respondent NSC submitted the information 14 days before verification, while respondent NKK submitted the information 9 days beforehand), 33 (citing Article 6.8) (stating that determinations may be made on the basis of facts available if parties do not supply requested information within a reasonable time).  Here, however, Plaintiff filed its submission approximately one month after the scheduled verification.  Accordingly, the Court finds Plaintiff's reliance on that panel decision misguided.

at 1363.  The Court found that the ITC failed to rationally support its conclusion, because the application of the agency's rationale to the first half of the period of investigation produced a contrary conclusion.  Id. at 1362-63.   In particular, the Court stated:

> Having employed a rationale to interpret data from the later part of the [period of investigation] in such a manner as to support its conclusion, the Commission may not ignore the fact that the same rationale applied to data from the earlier part of the [period of investigation] weakens its conclusion with regard to nonsubject imports.  Further explanation is required on remand for the agency to support its reasoning that nonsubject imports were so significant as to have displaced subject imports and the domestic like product.

25 CIT at __, 167 F. Supp. 2d at 1363.  Put differently, the Court held that the agency must provide further explanation to substantially support its rationale when that rationale would produce two inconsistent conclusions from the evidence.  See id.

The instant case, however, is distinguishable from ALTX, Inc. Commerce's conclusion that it lacked sufficient time to use the data in calculating the dumping margin within the postponed time frame for rendering the final determination is inconsistent with its prior statement that the agency would analyze Plaintiff's responses to Questionnaire III and make its final decision within 75 days of the publication of the preliminary decision.  The Department's conclusion, nevertheless, is reasonable.  Unlike the agency in ALTX, Inc., Commerce sufficiently supported its conclusion by providing a detailed explanation of its rationale.

The record reveals that reasoning.

> The May 30 and 31, 2001 submissions . . . would
> constitute such a major revision of China Steel/Yieh
> Loong's questionnaire as to qualify as a completely new
> response.  It would involve significant new subsets of
> home market sales, and accompanying narrative, submitted
> for the first time.  The same holds true for the missing
> model match data.  Even with the extended final
> determination, the Department would not be able to
> properly administer the investigation of this case. To
> [do so], the Department must: analyze the new
> submissions; allow an opportunity for comments from
> interested parties; issue additional supplemental
> questionnaires; conduct cost and sales verification of
> China Steel/Yieh Loong; issue verification reports; and
> allow interested parties to comment and request a
> hearing.

Issues and Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at 13.  The

Court therefore finds that Commerce's conclusion that it lacked

sufficient time to use CSC/YL's May 30-31, 2001 submission is in

accordance with law.

The Court finds that Plaintiff's third argument lacks merit.

Commerce is not required to extend the preliminary determination's

deadline beyond the normal 140 day limitation.  See  19 U.S.C. §

1673b(b)(1)(A).  Commerce may, however, extend that deadline "if"

the agency determines that the parties are cooperating, additional

time is needed to make the preliminary decision, and the case is

"extraordinarily complicated."  19 U.S.C. § 1673b(c)(1)(B).[27]  The

---

[27]The statute also permits the agency to extend the deadline
for making the preliminary determination in "extraordinarily
complicated cases" if the petitioner files a timely request for
an extension.  19 U.S.C. § 1673b(c)(1)(A).  As the Domestic
Producers did not file such a request in the instant case, that
subsection is irrelevant here.

agency determines that a case is "extraordinarily complicated" by considering "(I) the number and complexity of the transactions to be investigated or adjustments to be considered, (II) the novelty of the issues presented, or (III) the number of firms whose activities must be investigated." Id. Thus, Commerce has discretion to extend the deadline where it finds that a case is extraordinarily complicated. See id.

Here, Commerce did not find this case extraordinarily complicated, even though Plaintiff repeatedly asserted that Commerce's data requests required review and submission of thousands of transactions. See Denial Letter, P.R. Doc. 115, Pl.'s Ex. 9 at 2; Pl.'s Br. at 26-27. Instead, the record reveals that Commerce determined that the instant matter was controlled by the statutorily defined time limitations. Denial Letter, P.R. Doc. 115, Pl.'s Ex. 9 at 1-2. As the statute clearly grants the agency discretion to determine whether the instant matter was extraordinarily complicated and there is no indication that Commerce's determination was unreasonable, the Court defers to the Department's decision not to postpone the preliminary determination deadline. Accordingly, the Court finds Plaintiff's argument unpersuasive.

## IV. Conclusion

For the foregoing reasons, the court sustains the agency's

determination in part and remands in part for reconsideration in accordance with this opinion. Specifically, on remand, Commerce shall reconsider their affiliation determination in light of the fact that China Steel only became affiliated with Yieh Loong and in turn with the Yieh Loong affiliates, on February 21, 2000. Commerce's affiliation determination must consider this temporal aspect of Plaintiff's relationship with the Yieh Loong affiliates or explain why that factor is not necessary to its determination in accordance with the agency's regulations. The agency shall also make specific findings as to whether CSC/YL willfully decided not to cooperate or behaved below the standard of a reasonable respondent, or otherwise reconsider its decision to apply an adverse inference in choosing the available data to calculate the dumping margin. Commerce shall also reconsider whether the missing affiliate reseller data should be used in calculating the dumping margin. In particular, the agency must reconsider whether Plaintiff's home market sales to affiliates satisfy the five percent threshold required in the agency's regulations. The agency may not, however, include home market sales from China Steel to Yieh Loong in that calculation. Finally, Commerce must reopen the record for further consideration of the warranty costs data requested orally by the agency on May 3, 2001.

Commerce shall have 60 days to submit its remand determination. The parties shall have 15 days to submit comments

on the remand determination.  Rebuttal comments shall be submitted within 7 days thereafter.

_____
                                              Donald C. Pogue
                                                   Judge

Dated:      May 14, 2003,
            New York, New York